808 So.2d 694 (2001)
Drury DEROUEN
v.
MALLARD BAY DRILLING, LLC.
No. 2000 CA 1268.
Court of Appeal of Louisiana, First Circuit.
June 22, 2001.
*699 Craig A. Davis, Lafayette, for Plaintiff/2nd Appellant.
Patrick J. Veters, New Orleans, for Defendant/1st Appellant Mallard Bay Drilling, LLC.
Before: CARTER, C.J., WEIMER, and KLINE,[1] JJ.
CARTER, C.J.
Mallard Bay Drilling, L.L.C. (Mallard Bay) appeals the judgment of the trial court finding it liable for damages sustained by Drury Derouen in a maritime personal injury action. Drury Derouen (Derouen) appeals contending the award for loss of earning capacity should be increased.

FACTS
Drury Derouen was employed by Mallard Bay for approximately eighteen months. Derouen was assigned as a floor-hand (roughneck) to Mallard Bay Rig 56 (Rig 56), a submersible drilling rig. On March 3, 1998, the crew of Rig 56 had completed drilling operations at a site in St. Mary Parish and was in the process of dismantling the drilling equipment so that the rig could be moved to its next location.
At approximately 6:00 p.m. Derouen began his 12-hour shift. He was assisting in offloading some of the equipment when Elijah Robertson, the driller, asked Derouen for assistance in disconnecting a barite line. The barite line was a transfer hose connected to the rig's metal piping system that was being used to transfer barite from Rig 56 to a nearby barge. Barite is a dry substance used in drilling operations.
John Davis, who was the derrickman for Rig 56, indicated that the crew was having trouble offloading barite because the line kept getting plugged. Before the plugs *700 could be removed from the system, the pressure in the lines had to be relieved. In an effort to relieve or release the pressure, Davis bled the system down, i.e., opened a series of valves that allowed the pressure to escape.
Ronald Authement, the tool pusher and supervisor of the operation, was standing on a deck approximately eight feet above Derouen and Robertson. Authement told them to disconnect the barite line in order that the plug might be removed. Derouen placed both hands on the barite line while Robertson attempted to unhook the line. The barite line was secured by two connections (sometimes referred to as flaps or ears). When Robertson undid the first connection, barite began to come out of the line. Derouen realized that the barite line was still under pressure and yelled to Authement that the line was under pressure. Employing the use of profanities, Authement insisted Robertson and Derouen immediately remove the line. Jonathan Breaux, a roustabout, who had been assisting Derouen with the barite line, backed away from the area when he heard Derouen indicate there was still pressure in the line, leaving Derouen as the only person holding the barite line. Responding to Authement's urging, Robertson removed the second clamp on the line, which immediately caused the trapped pressure to explode from the piping, striking Derouen in the chest and knocking him backward. The force of the release knocked Derouen back several feet and slammed him against a pipe, causing injury to his lower back. One crewman described the sound of the releasing pressure as "an explosion."
The crew assisted Derouen to his feet, and he was sent inside to clean up. Initially, Derouen told Robertson that he did not think he needed to see a doctor. The night of the accident was the last night of the hitch so Derouen did not attempt to perform any of his duties after the accident. However, the next morning Derouen began to experience pain and stiffness in his back and neck. He also had a bruise on his lower back where he had been thrown into the pipe.
A few days later, Derouen contacted Mallard Bay about seeing a doctor for his pain. Mallard Bay sent Derouen to see Dr. Harold J. Hebert. Derouen saw Dr. Hebert three times, but his back and neck pain did not subside. Because of his condition, Derouen never returned to work another hitch for Mallard Bay.
Following the recommendation of a relative, Derouen went to see Dr. John Cobb, an orthopedic surgeon. Although his initial diagnosis was a back strain, Dr. Cobb began to suspect a possible internal disc injury when Derouen's symptoms persisted. Derouen's symptoms included numbness in his legs; sharp pain in his back and neck; moderate to severe headaches on a daily basis; sensation of pins and needles in his neck; spasms across his shoulders; and difficulty standing or sitting for long periods of time. When asked by Dr. Cobb to rate his pain on a scale from 1 to 10, with 10 being the most excruciating, Derouen described his pain as an 8.
The tests performed by Dr. Cobb indicated Derouen had an annular tear in one of the discs in his lower back that required surgery to resolve his symptoms. On December 1, 1998, Derouen underwent an anterior discectomy and anterior fusion of the L5-S1 area. Dr. Cobb also inserted BAK cages, which are titanium cages filled with a bone graft from Derouen's pelvic bone, to strengthen the fusion.
Derouen's post-surgery recovery proceeded well. By the end of April 1999, Dr. Cobb released Derouen at maximum medical improvement. Derouen testified that the surgery was successful in relieving him *701 of his pain. As a result of the surgery, Derouen is restricted to medium level work, which places him at a 50-pound lifting restriction. As a result of this restriction he can no longer hold heavy manual labor jobs or participate in activities that involve running, such as football, baseball, and basketball.
On January 7, 1999, Derouen filed suit against Mallard Bay for damages under 46 U.S.C. § 688, commonly referred to as the Jones Act, and general maritime law pursuant to the savings to suitors clause. Derouen asserted claims based on his employer's Jones Act negligence and the unseaworthiness of Rig 56. Derouen's claims for maintenance and cure were settled prior to the trial on the merits, and a consent judgment ordered Mallard Bay to pay Derouen's medical expenses in the amount of $51,764.43, as well as maintenance at a rate of $20.00 per day from the date of termination of Derouen's maintenance payments in November 1998, through April 28, 1999, the date Derouen reached maximum medical improvement.
Following a trial on Derouen's claims against Mallard Bay, the trial court ruled in Derouen's favor, finding liability based on Jones' Act negligence and unseaworthiness. The trial court ordered Mallard Bay to pay Derouen the sum of $699,702.00, plus interest, from the date of the incident, March 3, 1998, as compensation for his injuries.
Mallard Bay appeals the judgment and assigns error with the trial court's finding of Jones Act negligence; the trial court's finding that Rig 56 was unseaworthy; the trial court's failure to find Derouen at fault for his own injuries; the trial court's excessive award of general damages; the trial court's excessive award of loss of future wages (earning capacity); and the trial court's award of prejudgment interest on the award of future damages. Derouen appeals the trial court's award of loss of future wages as inadequate.

DISCUSSION

Standard of Review
A Louisiana appellate court applies the manifest error-clearly wrong standard of review of facts in general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 96. The two-part test for appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). This test dictates that a reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, inferences of fact should not be disturbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly *702 based on a credibility determination. Stobart, 617 So.2d at 882.
Mallard Bay argues that the findings of the trial court should not be given the usual deference because the trial court failed to articulate the theory or evidentiary facts upon which it based its decision. Mallard Bay argues this court should follow the actions of the supreme court in Bloxom v. Bloxom, 512 So.2d 839 (La. 1987), and conduct a de novo review.
The Bloxom court was presented with a products liability issue where the trial court had concluded that a vehicle's catalytic converter was unreasonably dangerous to normal use after it had ignited hay in a barn where it was parked. The Bloxom court noted that although deference to a decision of less than ideal clarity is accorded if the trial court's path could reasonably be discerned, such as when its findings, reasons, and exercise of discretion are necessarily and clearly implied by the record. However, the Bloxom court could not extend such deference to the trial court's decision because the trial court merely concluded the catalytic converter was unreasonably dangerous without explanation or support for this determination. In conducting its de novo review, the supreme court explored the concepts of "failure to warn" and "normal use" as they applied to the circumstances and issue presented. Bloxom, 512 So.2d at 843.
In the present case, the trial court issued eleven pages of written reasons in support of its judgment. Unlike the trial court in Bloxom, there is no conclusory determination assessing liability; rather the trial court applied the facts introduced into evidence to the standards of Jones Act liability and unseaworthiness. We find the trial court reasons adequately articulate the theory on which it bases Mallard Bay's liability. Accordingly, the decision of the trial court will be afforded the usual deference to a factfinder at the trial level.

Jones Act Negligence
An employer is vested with a fundamental duty to provide its seamen with a reasonably safe workplace. An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and any other breach of the owner's duty of care. Foster v. Destin Trading Corporation, 96-0803, pp. 9-10 (La.5/30/97), 700 So.2d 199, 204-205.
A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, in the context of a Jones Act negligence action, becomes one of the reasonable seaman in like circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 339 (5th Cir.1997).
In a Jones Act case, the court should determine the negligence of the employer according to the standard of a reasonable employer under like circumstances, and should determine the contributory negligence of the seaman according to the standard of a reasonable seaman under like circumstances. Vendetto v. Sonat Offshore Drilling Co., 97-3103, p. 9 (La.1/20/99), 725 So.2d 474, 479, cert. denied, 527 U.S. 1023, 119 S.Ct. 2369, 144 L.Ed.2d 773 (1999). The standard of causation in a Jones Act case is whether a defendant's negligence played any part, even the slightest, in producing the injury. Vendetto, 725 So.2d at 477.
*703 In reasons for judgment, the trial court relied upon the testimony of Ken Kaigler, who was accepted by the court as an expert engineer. In Kaigler's opinion, one of the reasons Mallard Bay was negligent was because Authement, the tool-pusher in charge of the operation, failed to give his crew an opportunity to remove the barite line in a safe manner. According to Kaigler, the accident could have been prevented by simply allowing the pressure in the barite line to bleed off for five to ten minutes at the connection Robertson had loosened.
After review of the record, we find there is a reasonable basis to support the trial court's finding that Mallard Bay was negligent under the Jones Act. Authement testified that when he first arrived in the area, he knew the barite line was under pressure by looking at it because it appeared "puffed up." He and the derrickman, John Davis, began to bleed the system of pressure by opening and closing a series of valves. Authement and Davis were standing on a platform approximately eight feet above where the barite hose was connected to the piping of Rig 56.
After opening one valve, Authement observed the barite line go limp, however, he knew there was barite in the hose, but he knew the hose would not go completely limp because barite remained in it. Authement testified that he assumed there was no pressure left in the line and turned around to talk to Davis. Authement did not observe the accident actually happen and could not recall if Derouen had told him the line was still under pressure. However, Authement did admit directing profanity at Derouen and Robertson during removal of the barite line. Although Authement admitted he was in a hurry to complete the job, he denied that his desire to quickly complete the task affected his regard for safety.
Derouen testified that he did not know the barite line was under pressure until Robertson pulled the pin to disconnect the first clamp. At that moment barite began spewing out of the connection, creating a cloud. Jonathan Breaux, an inexperienced roustabout, who initially assisted Derouen in holding the hose, backed away when the barite began to come out.
Once Derouen and Robertson realized the barite line was still pressurized, Derouen relayed that information to Authement. Derouen stated that he and Robertson then attempted to reconnect the barite line. Derouen testified that Authement responded with the use of an expletive and repeated that the line was to be disconnected at once. Derouen repeated to Authement that the line was under pressure, but Authement again insisted it be removed at that time.
The testimony of Breaux and Davis indicates that Authement was insistent that the barite hose be removed immediately despite Derouen's pleadings that the line was still under pressure. Both Derouen and Robertson testified that once Robertson unhooked the second clamp, the pressure immediately released from the hose, and that Derouen did not have time to get out of the way before being knocked down by the hose and the pressurized barite.
Based on our review of the record, the trial court had a reasonable basis to find Mallard Bay liable for Jones Act negligence. As the toolpusher, Authement was the supervisor in charge of the operation. Authement testified he knew the barite line was under pressure, and despite the effort to bleed the pressure off, he knew that barite still remained in the line. Knowing that barite still remained in the line, Authement made no attempt to discern whether that portion of the line was pressurized. Authement was aware that there was no valve or gauge on the barite *704 line to indicate trapped pressure and should have deduced that trapped pressure would be recognized when the connections on the line were loosened. Instead he ordered the line removed without checking with the crew to monitor what would happen when the barite line connections were loosened. Thus, according to his own testimony, Authement simply was not paying attention to Derouen or Robertson after he directed profanities at them and ordered the immediate removal of the barite line.
Being ever mindful that any employer negligence, however slight, which plays a part in producing an injury meets the standard of causation under the Jones Act, we find no error in the trial court's determination that Authement's negligence in supervising the crew and giving an order without determining if it was safe to carry out such order, triggered Mallard Bay's liability. Accordingly, we find no error in the trial court's determination that Mallard Bay committed Jones Act negligence.

Failure of Trial Court to Assign Comparative Fault
Mallard Bay asserts the trial court erred in not assigning any fault to Derouen because he knew the line was under pressure and failed to get out of the way. Comparative negligence applies to both unseaworthiness claims as well as Jones Act negligence actions. To prove comparative negligence on the part of the plaintiff, the defendant has to show that the plaintiff was contributorily negligent and that such negligence was a proximate cause of the resulting injury. The effect of finding negligence on the part of a seaman seeking recovery in an unseaworthiness action or Jones Act claim is only to reduce damages proportionately, but not to bar recovery. Foster, 700 So.2d at 204.
The toolpusher, Authement, and John Davis testified that Derouen was a good hand. Authement testified that Derouen did nothing to cause the accident and did not violate any safety precaution. Elijah Robertson testified that the accident happened immediately after he undid the second clamp, and thus Derouen did not have time to get away from the hose before the pressure blew out.
The record is devoid of any evidence that would indicate Derouen failed to act as a reasonable seaman at the time of the accident or that his actions caused or contributed to his own injuries. Considering at the time of the accident Robertson was following Authement's orders to disconnect the barite line when he unhooked the second clamp that releases the pressurized barite, we cannot say Derouen's continued assistance to the driller rather than his failure to back away caused or contributed to his own injuries. Accordingly, the trial court did not err in its failure to asses any fault on the part of Derouen.

Unseaworthiness
An owner of a vessel has an absolute duty to furnish a seaworthy vessel, and a breach of that duty gives rise to a claim for general damages. To state a cause of action for unseaworthiness, a plaintiff must allege an injury caused by a defective condition of the ship, its equipment or appurtenances. Whether a vessel is unseaworthy is a factual question to be decided on a case-by-case basis. Vendetto, 725 So.2d at 481.
To sustain the burden of proving unseaworthiness, Derouen was required to show that Mallard Bay provided a vessel (including appurtenances, gear, and equipment) that was not reasonably fit for its intended purpose. This does not mean Mallard Bay was under a duty to provide a perfect, or accident-free vessel; rather, its duty extended to providing a vessel and equipment that was reasonably suited for *705 the purposes of performing drilling operations. See Phillips v. Western Company of North America, 953 F.2d 923, 928 (5th Cir.1992).
There is a more stringent causation requirement for claims of unseaworthiness than Jones Act claims. In an unseaworthiness claim, the plaintiff must show that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Phillips, 953 F.2d at 928.
On the day of the accident, drilling operations had been completed and the crew was preparing the rig to move to another location. One of the tasks to be performed by the crew before the rig could be moved was to transfer the barite from the rig's bulk tanks to a nearby barge. According to the record, this procedure was not performed very often, perhaps as little as once a year. During the transfer, the barite line attached to the rig became plugged. As a result, the crew decided to clean the barite line. Before the barite line could be cleaned, the crew attempted to release the pressure from the rig's piping system. Authement testified that he assumed this relieved all of the trapped pressure, but in reality there was still trapped pressure in the barite line.
Kaigler testified that in his opinion, the accident was caused by trapped pressure between two plugs in the barite line. A valve about eight to ten feet above the barite line connection had been opened and closed. However, Kaigler opined that there must have been a plug between that valve and the hose connection that prevented any pressure from being released below that plug. Kaigler indicated that there was also a second plug at the end of the barite line itself prohibiting barite from being transferred into the barge tank. This created a situation of trapped pressure with no gauge in the line that would indicate the existence of pressure to the crewman. In Kaigler's opinion, Mallard Bay's failure to install gauges that would have detected pressure at strategic points along the piping system rendered the rig unseaworthy.
The trial court agreed with Kaigler and found Rig 56 unseaworthy because a defective design existed in the piping and appurtenances of the rig. The trial court accepted Kaigler's specific finding that the construction of the rig piping that connected the barite transfer line failed to include a small one-inch (bleed-off) valve at the bottom ell (the area below the valve and the barite line connection) that would allow the crew to release unseen or undiscoverable pressure or plugs in the line before disconnection.
However, Kaigler also indicated in his testimony that because of the way the rig was hooked up at the time, the only way this kind of pressure could have been bled off would have been to allow the connection to bleed for another five to ten minutes. Kaigler testified there could not have been a very large volume of pressure in the barite line because it was plugged off above the tank and below the last valve of the rig's piping system.
Our review of Kaigler's testimony indicates the absence of a valve at the bottom connection was an alternative method for releasing the trapped pressure. Considering Kaigler's testimony as a whole, it becomes apparent that the absence of a bleed-off valve on the transfer line did not play a substantial part in causing Derouen's accident. Rather, it was Authement's failure to monitor whether his crew could safely disconnect the barite line that caused the accident. Further, since pressure was trapped between two plugs, the *706 location of a valve or gauge may not have prevented this accident.
We are careful not to construe an isolated, personal negligent act of a fellow crewmember as a defect in the condition of the vessel, appurtenances, or crew. As the United States Supreme Court has held, an individual act of operational negligence does not render a vessel unseaworthy. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 500, 91 S.Ct. 514, 518, 27 L.Ed.2d 562, 567 (1971). Accordingly, we find the trial court erred in its determination that Rig 56 was unseaworthy.

General Damage Award
Mallard Bay asserts the trial court abused its discretion by awarding Derouen a total of $300,000.00 in general damages. The award was divided into $100,000.00 for physical pain and suffering; $100,000.00 for mental pain and suffering; and $100,000.00 for permanent physical impairment.
The discretion vested in the trier of fact is "great," even vast, so an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point, reasonably within that discretion. Youn, 623 So.2d at 1260.
In the present case Derouen was hit in the chest with barite and the barite line when the trapped pressure exploded out of the connection. The force of the explosion knocked Derouen off his feet and slammed him against a pipe three feet behind him. As a result of this blow, Derouen suffered from pain in his low back and neck area. Although Derouen's neck pain resolved three months after the accident, his problems in his lower back were attributable to a posterior annular disruption or tear in the ligament of the disc in the L5-S1 area. Derouen's condition was causing him mild to severe daily headaches, lower back pain, muscle spasms across his shoulders and trouble sitting or standing for long periods of time. Derouen described his daily back pain as an 8 on a scale of 1 to 10, with 10 representing excruciating pain. In order to resolve these symptoms, Derouen underwent an anterior discectomy and anterior fusion. Although Derouen experienced a good recovery and no longer experiences the pain that he did prior to his surgery, he has been placed on a medium work level restriction. The medium work level restriction recommends that he not lift anything over a weight of 50 pounds, which prohibits him from ever working in the oilfield again. At the time of his injury, Derouen was only 28 years old and had the majority of his working life ahead of him. In addition, Derouen must be careful not to put any unnecessary strain on the area where the fusion was performed and he is also prohibited from participating in recreational activities such *707 as football, baseball, and basketball, and picking up his own children. Finally, because of his injury, Derouen never could return to work in the oilfield after the accident, which undoubtedly caused an emotional strain of worrying over his employment future.
Considering the pain Derouen underwent, that his condition could be solved only through surgical intervention, and the restrictions that he must now live with, we cannot say the trial court abused its vast discretion in the $300,000.00 award of general damages. Accordingly, this assignment of error is without merit.

Loss of Future Earnings/Loss of Earning Capacity
The trial court awarded Derouen $350,000.00 in loss of future earnings and loss of earning capacity. Mallard Bay asserts an appropriate award would be $150,000.00, while Derouen contends the trial court's award is inadequate and should be raised to $703,416.00.
Earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Such damages are calculated on the person's ability to earn money rather than on what he actually earned before the injury. Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304, p. 16 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 442.
Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. The courts must exercise sound judicial discretion in determining these awards and render awards that are consistent with the record and that do not work a hardship upon either party. Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Daigle, 655 So.2d at 442. When reviewing a trial court's award for loss of earning capacity, an appellate court should give deference to the trier of fact. Birdsall v. Regional Electric & Construction, Inc., 97-0712, p. 7 (La.App. 1st Cir.4/8/98), 710 So.2d 1164, 1170.
In computing loss of future income, it is first necessary to determine whether and for how long a plaintiffs disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury; it is necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience. Daigle, 655 So.2d at 442.
Derouen was 28 years old at the time of his injury with no history of physical problems that would restrict the type of labor he could perform. Derouen's work history reveals that he worked at a Wal-Mart as a stock clerk earning minimum wage while completing a two-year course in small engine repair at Teche Area Vocational Technical School. Upon completion of the course, Derouen worked for eight years with Jeanerette Mills as a sewing machine mechanic. While at Jeanerette Mills, Derouen worked 40 to 60 hours per week, earning $9.80 per hour plus benefits. After Derouen's hours were cut because Jeanerette Mills was moving their operation overseas, Derouen applied for a job with Mallard Bay. Prior to his accident, Derouen had worked approximately eighteen months with Mallard Bay.
*708 At the time of his accident, Derouen's base pay was $11.90 per hour, which was supplemented $1.00 per hour by Burlington Resources (a contracting company). Derouen worked a hitch that was seven days on and seven days off, with seven, 12-hour shifts. For every hour over forty hours on the hitch, Derouen was paid time and a half.
Approximately one month prior to the accident, Derouen testified he had begun training as a derrickman. However, Authement testified that Mallard Bay had no immediate plans to promote Derouen to the position of derrickman. There was also conflicting testimony whether a GED was a prerequisite to being a derrickman and whether Derouen was capable of earning his GED, considering he only had an eighth grade education.
Following the accident and anterior fusion of his discs, Derouen is now restricted to performing light to medium duty work. The restriction placed upon Derouen by Dr. Cobb prevents him from lifting anything over 50 pounds. Such a restriction prevents Derouen from returning to his prior jobs of sewing machine mechanic or floorhand in the oilfield.
Dr. Glenn Hebert, Derouen's vocational rehabilitation counselor testified that Derouen had skills to perform small engine repair work that would give him an opportunity to earn $5.15 to $7.50 an hour in an entry-level position. Dr. Hebert conceded that Derouen could later earn as much as $9.00 per hour after gaining experience in a new job. Dr. Hebert testified that Derouen's future prospects were limited considering his opinion that Derouen may not be able to earn a GED.
Deborah Bailey, who was accepted by the court as an expert licensed rehabilitation counselor, testified on behalf of Mallard Bay. Ms. Bailey listed jobs that Derouen was capable of starting with no additional training that paid between $6.00 and $8.00 per hour entry-level. Ms. Bailey testified that she believed Derouen was capable of earning his GED. However, she stated that it was entirely too speculative to assume Derouen would have progressed to the position of derrickman had he not been injured.
R. Douglas Womack, Ph.D., was accepted by the court as an economic expert on behalf of the plaintiff. Dr. Womack assumed a worklife expectancy of 27.63 years; he used the figure of $14.25 an hour as derrickhand working hitches equivalent to seven days on and seven days off, which provided an estimated future annual salary of $39,273.00. Using these assumptions, Dr. Womack calculated that the present value of Derouen's lost earnings/loss of earning capacity was $927,507.00, assuming Derouen never returned to the labor force. Dr. Womack calculated a figure of $670,550.00 as the present value of the total economic loss, assuming Derouen returned to the labor force at a rate of $6.25 per hour.
Dr. Womack also provided figures for Derouen's economic loss, assuming Derouen would work six years as a derrickhand, then become a driller, earning $46,000.00 per year, which would put his losses at $1,012,137.00, assuming no return to the labor force and $755,180.00 with a return to the labor force earning $6.25 an hour.
The trial court was also presented with the testimony of John Theriot, who was accepted as an expert in forensic accounting. Mr. Theriot testified on behalf of Mallard Bay and presented his estimates on Derouen's loss of earning capacity. Mr. Theriot assumed Derouen had a work life expectancy of 23.19 years and an annual wage of $24,752.00 based on Derouen *709 earning $11.90 per hour. According to Theriot, the present value of Derouen's loss of earning capacity, given the assumption he would obtain a minimum-wage job, was a range between $205,658.00 and $260,526.00. Theriot's report also provided ranges for Derouen's loss of earning capacity if he obtained a job paying $6.00 per hour ($152,958.00 to $200,915.00), and $7.00 per hour ($154,252 to $202,616.00).
The trial court was presented with two very different estimates of Derouen's loss of earning capacity that utilized differing factors about what would have affected his future wage earning. At trial, Derouen testified that he had a job lined up assisting a friend as a cabinetmaker earning $6.50 an hour. Although Mallard Bay contends that the trial court struck a balance between the estimates offered by it and Derouen, our review of the record indicates the trial court exercised sound judicial judgment. Under the facts of this case, we are reluctant to extend the concept of sound judicial judgment to a complete acceptance of one parties' economic estimate over an estimate submitted by the opposing party. The trial court had many factors to consider regarding Derouen's future earning capacity, and although no expert testified to the exact figure of $350,000.00 as representative of Derouen's loss, we cannot say the trial court erred in this award.

Award of Prejudgment Interest on the Award of Future Damages
Mallard Bay argues that the trial court erred in awarding prejudgment interest on Derouen's future damages. At the outset we note that although the trial court apportioned Derouen's loss of earning capacity, which is a future damages award, the trial court did not apportion Derouen's general damages into what amount represented past and future awards.
The Louisiana Supreme Court addressed the issue of prejudgment interest on future damage awards in Milstead v. Diamond M Offshore, Inc., as follows:
An award of prejudgment interest in state maritime cases is substantive in nature such that federal law controls.
Under federal law, a plaintiffs entitlement to prejudgment interest in a maritime case depends upon the nature of his claim, particularly the basis from which the federal court derives its subject matter jurisdiction. Federal courts derive their maritime jurisdiction from either the constitutional and statutory grant of such power, referred to as "admiralty jurisdiction," or from conventional sources such as diversity or federal question.
If the court's jurisdiction is based solely upon conventional sources, such as federal question, the court applies federal law with respect to awarding interest. Since the statute governing the payment of interest in civil cases in federal courts, 28 U.S.C. § 1961, provides that interest shall be calculated from the date of entry of the judgment, prejudgment interest is generally prohibited in such maritime cases. As such, the courts have consistently refused to grant prejudgment interest on awards recovered under the Jones Act.
Nonetheless, there is an exception to this general rule. Even if the court hears a suit based solely upon federal question, it can sit in "admiralty" if the case is tried before a judge and not a jury. Thus, when an action is based strictly upon the Jones Act, prejudgment interest may be recovered as long as the case is tried to the court and the court exercises its admiralty jurisdiction.
Likewise, where the court's power to hear a case arises from its admiralty *710 jurisdiction, such as a general maritime action for unseaworthiness, the applicable substantive law is federal maritime law, which gives courts the discretion to award prejudgment interest.
In sum, federal courts have the discretion to award prejudgment interest on causes of action based upon their admiralty jurisdiction. However, courts have clearly chosen not to grant prejudgment interest on awards for future losses, including future earnings and future pain and suffering. The rationale underlying this rule being that "recovery of interest on losses not yet incurred effectively grants the recipient double recovery."
676 So.2d at 96-97 (Citations omitted).
In the present case, the trial court has discretion to grant Derouen prejudgment interest on the sums awarded as past damages in his Jones Act claim. However, the trial court does not have authority to grant interest on the awards for future damages, whether such awards are future loss of earnings/loss of earning capacity or future pain and suffering. Although the trial court apportioned an award for loss of earning capacity, it did not apportion Derouen's general damage award into past and future damages. Accordingly, we remand the case to the trial court for an apportionment of the general damage award into past and future damages. To the extent that the trial court awarded prejudgment interest on Derouen's award for loss of earning capacity, that was error.

CONCLUSION
Based on our review of the record, the judgment of the trial court is affirmed in all respects with the exceptions that the trial court's determination that Rig 56 was unseaworthy and the award of interest of Derouen's loss of earning capacity are reversed. This matter is also remanded to the trial court for an apportionment of what portion, if any, of the general damages award, (which consisted of $100,00 for physical pain and suffering, $100,000 for mental pain and suffering, and $100,000 for permanent physical impairment) constitutes future damages. Once this determination is made, the trial court can award prejudgment interest only on that portion of the award that is not an award of future damages. The trial court is to order interest from the date of the incident until payment is made on all sums awarded for past damages. All costs of this appeal are assessed to defendant Mallard Bay Drilling, L.L.C.
AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.