832 So.2d 1141 (2002)
Lewis FRAZIER, Jr.
v.
ZAPATA PROTEIN USA, INC.
No. 02-0605.
Court of Appeal of Louisiana, Third Circuit.
December 11, 2002.
*1144 Lionel H. Sutton III, Sean Daniel Alfortish, Law Offices of L.H. Sutton, III, New Orleans, LA, for Plaintiff/Appellant, Lewis Frazier, Jr.
Alan K. Breaud, Breaud & Lemoine, Lafayette, LA, for Defendant/Appellee/Appellant, Zapata Protein USA, Inc.
John Robert Shea, John Shea & Associates, Lafayette, LA, for Intervenor, John Robert Shea.
Frank J. D'Amico Jr., New Orleans, LA, for Intervenor, Frank J. D'Amico Jr.
Kristina Boyle Webb, Shapiro & Shapiro, Baton Rouge, LA, for Intervenor, Advocate Financial, L.L.C.
Thomas M. Daigle, Lafayette, LA, for Intervenor, Thomas M. Daigle.
Ashley Spencer Gulden, New Orleans, LA, for Intervenor, Ashley Spencer Gulden.
Court composed of NED E. DOUCET, JR., Chief Judge, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
Both the plaintiff, Lewis Frazier, and the defendant, Zapata Protein (USA), Inc., appeal the jury's judgment and rulings by the trial court in this matter. For the following reasons, we affirm as amended.

FACTS
On October 9, 1995, Frazier, who was employed as a seine setter by Zapata, *1145 allegedly suffered a work-related accident aboard a purse boat of the pogey fishing boat, the TIGER SHOAL. Frazier alleged that he fell and hit his left side, injuring his back, when the mate purse boat bumped the TIGER SHOAL while releasing from it in order to go set out its net. As a result of this injury, Frazier underwent two back surgeries.
Zapata fishes for menhaden, or pogey fish, six months out of the year off the coast of Cameron Parish, Louisiana. In doing so, it sends out numerous steamers, like the TIGER SHOAL, which are directed to the schools of fish by spotters located in small airplanes. When a school of fish is located, the spotters direct the steamer to that location. Once the steamer reaches the school, it blows its whistle twice to signal the fishermen to man the two purse boats tied to its stern. The purse boats, known as the captain boat and the mate boat, are lashed together and tied closely to the steamer's stern. Once the purse boats are manned, the steamer sounds its whistle again to signal the release of the two boats, each of which contains half of the net. The purse boat operators throw the boats into gear and move them forward up against the stern of the steamer so that an engineer on the steamer can loosen the running lines holding the boats to it. Crew members on the purse boats then unhook the running lines, releasing the purse boats from the steamer. After their release, the purse boats approach the school of fish and encircle it with the net. Once the fish are caught, the net is then lifted and the fish are pumped aboard the steamer and held until it reaches Zapata's processing plant located in Cameron. The capture of fish in this manner is called making a set.
Frazier claimed that he was injured on October 9, 1995, when the engineer loosened the slack in the running line holding the mate boat to the steamer before the mate, Brian Rice, had the boat up against the steamer's stern. He alleged that Rice then had to run the purse boat forward in order to create slack in the running line so that it could be unhooked from the steamer. Frazier claimed that Rice bumped the purse boat hard into the steamer causing him to fall across a thwart located in the rear of the boat where he was stationed. After the set was completed, Frazier reported the accident to Rice, who in turn, reported it to Captain Charles Robinson, the captain of the TIGER SHOAL. Although Frazier completed the fishing season, which ended approximately three weeks later, he performed only light duty work during that time.
On June 10, 1996, Frazier filed suit against Zapata pursuant to the Jones Act and general maritime law via the Savings to Suitors Clause, 28 U.S.C. § 1333, seeking damages based on the doctrine of unseaworthiness and negligence, and maintenance and cure benefits. The maintenance and cure issue was separated from the main demand and tried as a bench matter, with the trial court awarding Frazier maintenance and cure benefits and ordering Zapata to pay for his surgery. Two petitions of intervention were filed by attorneys previously hired by Frazier to represent him in this matter.
This matter was tried by a jury. At the close of Frazier's evidence, the trial court granted a directed verdict in favor of Zapata on his claim for damages based on unseaworthiness. It also dismissed Zapata's affirmative defense of contributory negligence during the jury charge conference. At the close of evidence, the jury rendered judgment in favor of Frazier awarding him a total of $200,000 in damages *1146 for past and future pain and suffering, past lost earnings, and future loss of earnings. A judgment was rendered by the trial court awarding Frazier the aforementioned damages, and further ordering Zapata to pay interest on the judgment from the signing of the judgment until paid. It further ordered that each party would bear their own court costs and expert fees, except that Zapata would pay 60% of the court costs incurred by Frazier up until the date of judgment. A motion for new trial filed by Zapata was denied by the trial court. Both Frazier and Zapata appeal suspensively from this judgment.

ISSUES
On appeal, Frazier raises five assignments of error. He argues that the jury abused its discretion by only awarding him $50,000 in general damages and $150,000 in past lost wages and future loss of earnings. He further argues that the trial court erred in granting the directed verdict as to his unseaworthiness claim, in failing to award prejudgment interest from the date of the accident, and in assessing him with 40% of his court costs.
Zapata raises three assignments of error. It argues that the jury erred in finding liability on its part pursuant to the Jones Act. It further claims that the trial court erred by denying its motion for a directed verdict on the issue of Frazier's Jones Act claim and in dismissing its affirmative defense of comparative fault without the benefit of a motion for a directed verdict by Frazier on that issue.

LIABILITY
Jones Act
The Jones Act allows an injured seaman to bring a negligence action against his employer. 46 U.S.C.App. § 688 (1994).
The Jones Act allows an injured seaman to bring a negligence suit against his employer 46 U.S.C.App. § 688 (1944). The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. See id. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Schurlock [Scurlock] Marine, Inc., 107 F.3d 331, 335-36 (5th Cir.1977 [1997]). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. Id. at 334-35.

Foster v. Destin Trading Corp., 96-0803, pp. 3-4 (La.5/30/97), 700 So.2d at 208, (on rehearing). The manifest error-clearly wrong standard of review applies to matters brought pursuant to the Jones Act.
After reviewing the record in its entirety, we cannot say that the jury erred in finding Jones Act liability on the part of Zapata. Differing views of the evidence *1147 were presented to the jury with regard to the negligence of Zapata in causing Frazier's back injury. Frazier and his witnesses, Austin Owens and David Sharp, who were both on the purse boat at the time of the alleged accident, testified that Rice bumped the purse boat into the steamer hard enough to cause them to fall. Although neither Owens nor Sharp actually saw Frazier fall, both testified that Frazier appeared hurt after that incident and that they had to help him out of the purse boat after the set was completed. Zapata's witnesses, Rice and Robinson, both testified that the bump never occurred. Since the jury was presented with conflicting testimony on this issue, we cannot say that it was unreasonable in finding liability on the part of Zapata. Accordingly, Zapata's assignment of error pertaining to its Jones Act liability is dismissed as being without merit.
Unseaworthiness
Frazier next argues that the trial court erred in granting a directed verdict in favor of Zapata, which dismissed his claim of unseaworthiness. We disagree. In dismissing this issue, the trial court stated that there was no physical evidence in the record of an unseaworthy condition aboard the TIGER SHOAL or its purse boat.
A directed verdict is the proper procedural vehicle to foreclose a jury's decision on a matter after the close of evidence by the opponent of the moving party. As such, it should only be granted when the facts and inferences, when viewed in a light most favorable to the nonmovant, point so strongly in favor of the movant that the trial court feels that reasonable persons would not reach a contrary verdict. Hebert v. BellSouth Telecomm., Inc., 01-223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, writ denied, 01-0223 (La.6/6/01), 787 So.2d 614; Courville v. City of Lake Charles, 98-73 (La.App. 3 Cir. 10/28/98), 720 So.2d 789. In reviewing the correctness of a directed verdict, an appellate court analyzes the evidence in light of the substantive law relevant to the nonmovant's claim. Odom v. State Dep't of Health and Hosps., 98-1590 (La.App. 3 Cir. 3/24/99), 733 So.2d 91.
Pursuant to general maritime law, a seaman is entitled to work on a seaworthy vessel. Thus, a vessel owner has an absolute duty to furnish a seaworthy vessel, and a breach of that duty will give rise to a claim for general damages. Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/00), 725 So.2d 474, cert. denied, 527 U.S. 1023, 119 S.Ct. 2369, 144 L.Ed.2d 773 (1999). An action for unseaworthiness arises if a seaman alleges that he was injured as a result of a defective condition of the vessel, its equipment, or its appurtenances. Id. The unseaworthiness of a vessel is a question of fact, which will be determined on a case-by-case basis. Id.
There is a more stringent causation requirement for claims of unseaworthiness than Jones Act claims. In an unseaworthiness claim, the plaintiff must show that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Phillips, 953 F.2d at 928.
Derouen v. Mallard Bay Drilling, LLC, 00-1268, p. 10 (La.App. 3 Cir. 6/22/01), 808 So.2d 694, 705.
After reviewing the record, we find, as did the trial court, that Frazier *1148 presented no evidence showing that an unseaworthy condition of the TIGER SHOAL or its purse boat played a substantial part in bringing about his injury. Accordingly, we find no error in the trial court's grant of a directed verdict on the issue of unseaworthiness in favor of Zapata.
Comparative Fault
In its next assignment of error, Zapata argues that the trial court erred in dismissing its affirmative defense of comparative fault without the benefit of a directed verdict by Frazier on that issue. It claims that the trial court dismissed this issue sua sponte during the jury charge conference and did not present this issue to the jury. There is no record of this conference in the record. We agree that it was error for the trial court to dismiss this issue on its own motion, since only a party may bring a motion for a directed verdict on an issue. La.Civ.Code art. 1810; see Morgan v. Mazda Motor of America, 93-1378 (La.App. 3 Cir. 5/4/94), 640 So.2d 453. However, we find this error to be harmless since the record is devoid of any evidence that Frazier failed to act as a reasonable seaman would act under the same circumstances. Foster v. Destin Trading Corp., 96-0803 (La.5/30/97), 700 So.2d 199. Accordingly, this assignment of error is dismissed as being without merit.

DAMAGES
In his next assignment of error, Frazier argues that the jury abused its discretion by only awarding him $50,000 in general damages. We agree.
Dr. William Foster, a neurosurgeon, began treating Frazier on November 13, 1995. A November 20, 1995 MRI revealed degenerative disc changes at L3-4 and, to a lesser extent, at L4-5. It further revealed a bulging disc at L3-4, with a posterior osteophyte formation, or bone spur, combining with hypertrophy or thickening of the ligamentum flavum and facet joint, to create a stenosis or narrowing of the spinal canal. The bulging disc produced a mass effect on the ventral aspect of the thecal sac surrounding the nerve roots. Similar findings were noted to a lesser extent at L4-5. Dr. Foster noted that Frazier's spinal stenosis and bulging disc predated his work-related injury, but opined that, according to his history, he was asymptomatic prior to his accident.
A May 14, 1996 myelogram and postmyelogram CT scan revealed degenerative changes at L3-4 and L4-5, hypertrophy of the ligamentum flavum, and a small spinal canal. As a result of this test, Dr. Foster felt that Frazier had a definite defect on the left oblique at L4-5, small impressions at L3-4, moderate central canal stenosis, and a bulging disc at L3-4 and L4-5. He also felt that Frazier had a classic radiculopathy or nerve root compression at L5.
Dr. Foster treated Frazier conservatively, including injections for pain by Dr. Kevin Goran and physical therapy. However, when this failed, he performed surgery on September 29, 1998, which involved a lumbar laminectomy from L3 through L5 on both sides and a decompression of the nerve roots bilaterally at L4, L5, and S1. Surgery improved Frazier's leg pain, however, he began experiencing back pain several months later. Dr. Foster sent him to Dr. Dale Gunderson, an orthopedic surgeon, to evaluate him for a fusion. Dr. Foster opined that Frazier's complaints were caused by his degenerative changes, which were aggravated by his work-related accident. Following surgery, *1149 he recommended that Frazier be restricted to sedentary to light duty work.
Dr. Bernauer determined that Frazier had an unstable back and performed surgery on him on May 30, 2000. This surgery, which took approximately five hours, entailed a lumbar anterior interbody fusion of the L4-5 and L5-S1 disc levels using bone from Frazier's hip, as well as the placement of screws posteriorly into the vertebra at L4, L5, and the tail bone, which hooked into a plate system in order to stabilize his back. Frazier was hospitalized four days as a result of this surgery.
Dr. Bernauer testified that Frazier had not yet reached maximum medical improvement and that he had not been released to return to work at the time of the trial. He estimated that it would be at least one year before he could determine whether the fusion had solidified. Once that occurred, he stated that Frazier would undergo a functional capacity evaluation and a three-to-four month work hardening program before he released him for work. After that, Dr. Bernauer testified that he would restrict Frazier to a maximum lifting of twenty-five pounds, repetitive lifting of ten to fifteen pounds, and no stooping, crawling, squatting, bending, or climbing. He further stated that Frazier would have a 50% anatomical disability of his back and that he would restrict him to sedentary to light work. Dr. Bernauer opined that Frazier would never be able to work offshore.
Prior to his accident, Frazier testified that he liked playing basketball, dancing, attending church activities, and doing outside activities, but that he has been unable to perform any of these activities since the accident. Subsequent to his accident, he stated that it was painful for him to move, which caused him to limp, his feet to swell, and for him to feel a burning sensation throughout along with pins and needles. He further stated that he was unable to sleep and was taking pain medication at all times. Frazier testified that he suffered a lot of pain during the first surgery, which did not diminish afterwards. He stated that he did not wish to undergo the fusion, but stated that he was glad that he did so, since that surgery has helped him. He stated that he still has pain if he does not take his pain medication and that he is still being treated by Dr. Goran for pain.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court discussed the standard to be applied in the review of damage awards:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
*1150 After reviewing the record in this matter, we find that the jury abused its vast discretion by only awarding $50,000 in general damages to Frazier. Considering the effect that this injury has had on him under the particular facts of this case, we feel that the award is too low beyond that which a reasonable trier of fact would assess. After reviewing other cases involving similar injuries, we feel that the lowest amount that a reasonable trier of fact could award for a plaintiff undergoing a laminectomy from L3 through L5, decompression of the nerve roots bilaterally at L4 through S1, and a fusion at two levels resulting in a residual disability of 50% in his back along with the usual accompanying restrictions is $250,000. Accordingly, the judgment of the trial court is amended to increase the general damage award from $50,000 to $250,000.
ECONOMIC DAMAGES
In his next assignment of error, Frazier argues that the jury abused its discretion in only awarding him $100,000 in past lost wages and $50,000 in future loss of earnings and fringe benefits.
The burden of proving a loss of income is on the plaintiff. Sengsouly v. Allstate Ins. Co., 99-22 (La.App. 3 Cir. 6/9/99), 744 So.2d 649, writ denied, 99-2526 (La.11/19/99), 749 So.2d 677. Damages for past lost wages can be calculated with mathematical certainty from the proof submitted at trial and is an exception to the much discretion award. Id. "However, the jury must have a reasonable basis for exercising its discretion, and the record must provide a factual basis for the award." Myers v. Broussard, 96-1634, p. 17 (La. App. 3 Cir. 5/21/97), 696 So.2d 88, 97. With regard to loss of future earnings, damages need not be proven with mathematical certainty, but only be proven by such proof as reasonably establishes the plaintiff's claim. Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5 (La.App. 3 Cir.1991). Factors to consider in determining an award for future loss of income include the plaintiff's physical condition before the injury, his work history, work consistency, the amount he probably would have earned absent the injury complained of, and the probability that he would have continued to earn wages for the remainder of his work life. LeBlanc v. Steptore, 98-808 (La.App. 3 Cir. 12/9/98), 723 So.2d 1056, writ denied, 99-0087 (La.3/12/99), 739 So.2d 772.
Past Lost Wages
The jury was presented with testimony from two economic experts pertaining to the economic damages suffered by Frazier. Dr. Charles Bettinger, a forensic economist and statistician, testified that Frazier's past lost wages from the date of the accident up until the date of trial was $148,897. This was based on his actual earnings in 1994 of $28,500, multiplied by 5.42 years, and adjusted to reflect his payment of state and federal taxes and a 6.2% social security benefit of $9,586. Dr. Kenneth Boudreaux, testifying on behalf of Zapata, estimated that Frazier's past lost wages amounted to $99,144. Dr. Boudreaux reached this amount by averaging Frazier's wages for 1993 through 1995 and then multiplying that amount, $20,738, by the length of time between his accident and the trial. Because we find that the jury's award of $100,000 for past lost wages is supported by the record, we cannot say that it erred in awarding that amount. Accordingly, the assignment of error as it pertains to past lost wages is found to be without merit.
Future Loss of Earning Capacity
At the time of the accident, Frazier was thirty-five years old. By the time *1151 this matter came to trial, he was forty years old. He stated that he grew up in Beaufort, North Carolina, and that he finished high school and attended college there for two years, playing basketball and majoring in political science. Frazier testified that he began working for Zapata in 1993 and that he completed the 1993 and 1994 fishing seasons. He stated that he also completed the 1995 fishing season by performing light duty work. Prior to his accident, Frazier stated that he had no history of back problems and that he worked for seventeen years, off and on, as a fisherman. In addition to working in the fishing industry, Frazier testified that he also worked as a public relations consultant for TWA in 1978, and as a stock manager for a warehouse in Alexandria, Virginia. He explained that his job with TWA entailed greeting passengers and directing them to the correct terminal, while his job as a stock manager involved stocking the warehouse. In addition to working as a fisherman in Louisiana, Frazier stated that he also worked as such in North Carolina and Mississippi.
Prior to his accident, Frazier's income for 1994 was $28,508. His income for 1995 was $21,150. Frazier worked six months as a pogey fisherman during the pogey season, and then drew unemployment for the remaining six months of the year. In 1994, his wages from Zapata equaled $24,130, while his wages in 1995 were $21,150. He drew unemployment compensation of $4,378 in 1994. After his accident in October 1995, Frazier testified that he was only able to draw unemployment until June 1996.
At the time of the trial, Frazier had not yet reached maximum medical improvement. However, once he reached such a point, Dr. Bernauer testified that he would still have a 50% disability rating for his back. He further stated that Frazier would have to undergo a functional capacity evaluation and a work hardening program, after which he would be restricted to lifting a maximum of twenty-five pounds, repetitive lifting of ten to fifteen pounds, and no stooping, crawling, squatting, bending, or climbing. Dr. Bernauer further opined that Frazier would never be able to return to work as a fisherman.
Dr. Bettinger estimated that Frazier had a work-life expectancy of 24.58 years, which he multiplied by $28,500 and then discounted by the present day factor of 2½%, for a total future loss of earnings of $480,715. He further determined that Frazier's future loss of fringe benefits from this accident amounted to $244,009: $18 per day in meal money for a total of $59,777, $32,163 in Social Security contributions, and $152,069 in health and dental insurance. Dr. Bettinger testified that Frazier would have a total loss of $724,724 if he was totally disabled. If he returned to a minimum wage job over his expected work-life, then Frazier would still suffer a loss in the amount of $517,716.
Dr. Boudreaux determined that Frazier had 16.84 years of work life expectancy from the date of trial. Using $20,738, the average of his earnings from 1993 through 1995, Dr. Boudreaux determined that Frazier's future loss of earnings would amount to $118,092, if he held a minimum wage job. If Frazier earned $6.00 per hour, then Dr. Boudreaux determined that his loss would be $95,490. If he earned $7.50 per hour, then his loss would be $58,085. Dr. Boudreaux testified that Frazier's loss of fringe benefits would be $11,430 for his loss of meal money. He stated that he assumed Frazier would be steadily employed in the future, so he did not include *1152 any value for his loss of health insurance and other fringe benefits.
Although Dr. Boudreaux admitted that the majority of pogey fishermen drew unemployment during the six months that they did not fish, he did not include this in figuring Frazier's income. However, he agreed that unemployment compensation is considered income, and that a pogey fisherman would be losing income if he could no longer work or draw unemployment. Dr. Boudreaux further testified that he arrived at Frazier's base income by averaging his incomes from 1993 through 1995, despite the fact that he only had a W-2 for 1993, rather than a tax return. He did agree that, if unemployment compensation was considered income, then he could not include 1993 in averaging the income since he did not know how much unemployment compensation Frazier drew that year. Dr. Boudreaux testified that the average of Frazier's 1994 and 1995 incomes was $24,829. Based on this figure, he determined that Frazier's future loss of earnings would be $306,905 if he was totally disabled. He stated that this was a mid-range figure and that $330,228 would be a high-end figure.
Dr. Boudreaux stated that the meal costs that Frazier was losing could be as high as $8 per day, but that a moderate range would be $6-7 per day. He testified that Zapata provided Frazier with a typical range of benefits, whose total cost could range between 8-12% over and above his payroll. If Frazier was totally disabled, then his lost benefits should be increased by 10-12%. If Frazier's loss of future earnings was $250,000 ($25,000 + 10%), then his lost benefits would range from $25,000 to $28,000. If his future loss was $330,000, then his lost benefits would range from $33,000 to $36,000.
Although a jury's award for loss of earnings is entitled to great deference on review, we find that the jury in this instance has abused its discretion by awarding Frazier only $50,000 for his future loss of earnings. Since this award is based on his future earning capacity, we find that the jury should have considered Frazier's total past income, and not just his wages from his earnings at Zapata. Even Dr. Boudreaux agreed that the unemployment compensation drawn by Frazier was income and that he would be losing that income if he was no longer able to work as a pogey fishermen or draw unemployment during the off season. Furthermore, we believe that Frazier should, at least, be able to earn minimum wages in the future. Accordingly, we amend the jury's award for the future loss of earnings from $50,000 to $270,000. This includes $200,000 for future lost earnings and $70,000 in lost fringe benefits ($50,000 in health and dental insurance and $20,000 in meal money).

PREJUDGMENT INTEREST
In his next assignment of error, Frazier argues that the trial court erred in failing to award him prejudgment interest because it erroneously dismissed his unseaworthiness claim. However, since we found no error in the trial court's dismissal of Frazier's unseaworthiness claim and this matter was tried before a jury, we find no error in the trial court's refusal to award him prejudgment interest. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89. This assignment of error is dismissed as being without merit.

COURT COSTS
In his final assignment of error, Frazier argues that the trial court erred in ordering him to pay 40% of his own court costs. La.Code Civ.P. art.1920 provides that the trial court "may render judgment for costs, or any part thereof, *1153 against any party, as it may consider equitable." The trial court is entitled to great discretion in its decision to cast costs and will not be reversed on appeal absent an abuse of that discretion. Pelafigue v. Sudduth, 01-807 (La.App. 3 Cir. 5/15/02), 820 So.2d 583. Although the party found liable is generally the party cast with the court costs, we cannot say that the trial court abused its vast discretion in casting Frazier with 40% of his own court costs since he lost on the issue of unseaworthiness. Accordingly, this assignment of error is also dismissed as being without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to increase the amount of general damages awarded to the plaintiff-appellant/appellee, Lewis Frazier, from $50,000 to $250,000. The judgment is further amended to increase the amount of economic damages from $150,000 to $370,000. The judgment is affirmed in all other respects. The costs of this appeal are assessed against the defendant-appellee/appellant, Zapata Protein (USA), Inc.
AFFIRMED AS AMENDED.