820 So.2d 583 (2002)
Pamela Ann PELAFIGUE
v.
James E. SUDDUTH, II.
No. 01-807.
Court of Appeal of Louisiana, Third Circuit.
May 15, 2002.
Rehearing Denied July 10, 2002.
*586 Kathleen Kay, Attorney at Law, Lake Charles, LA, for Plaintiff/Appellee/Appellant: Pamela Ann Pelafigue.
Peter A. Ciambotti, Attorney at Law, Lake Charles, LA, for Defendant/Appellant/Appellee: James Edward Sudduth, II.
Court composed of SYLVIA R. COOKS, OSWALD A. DECUIR, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
In this community property partition, both parties appeal from a judgment ordering the husband to make an equalization payment of $31,667.41 based upon the trial court's division of assets. For the following reasons, we amend the judgment to include a savings account that was inadvertently omitted from the judgment and to delete one asset, the Armstrong Street property, that we find was mistakenly classified as community. The result of these changes is that the equalization payment to the wife is reduced to $22,382.95.

Facts and Procedural History
Pamela Meche (now Pelafique) and James Edward "Bo" Sudduth, II were married on March 3, 1984, in Lake Charles, Louisiana. They had one child, James Edward "B. J." Sudduth, III. On December 19, 1991, Mrs. Pelafique (then Sudduth) filed for divorce. Instead of proceeding with this legal action, however, the parties continued to live separately, but agreed to build a house together, as their existing home had caused some of their marital difficulties. Before beginning construction of the new home, they executed an "Agreement to Build" in which they agreed that the house would be built only with community funds that would be deposited into a special "house account" and that any personal labor provided by either party would not be compensated and would not be considered in the cost of the home's construction. This agreement also provided that if the parties reconciled, the new house would continue to be community property, but in the event of divorce, Mrs. Pelafique would be given the first option to purchase the house at the cost of its construction. The parties did not reconcile *587 after the home was completed, and they divorced on February 23, 1993. Mrs. Pelafique married her present husband on December 13, 1993. Mr. Sudduth had also remarried before the conclusion of this proceeding.
On November 9, 1994, Mrs. Pelafique filed this petition for partition of community property. The trial proceeded intermittently from January 1996 through July of 1999. On March 13, 2000, the trial court issued reasons for judgment that had to be amended because of an error in calculation. The amended reasons for judgment, issued on April 13, 2000, included the following recapitulation:

Assets Awarded to Mrs. Pelafique $198,821.48
Assets Awarded to Mr. Sudduth $362,742.85
 ½ the Amount Mr. Sudduth Must Pay to Equalize $81,960.69
Reimbursements owed to Mr. Sudduth $ 51,202.56
Reimbursements owed to Mrs. Pelafique $ 909.28
 Amount Mrs. Pelafique Must Pay to Equalize $50,293.28
 __________
 Balance Owed to Mrs. Pelafique $31,667.41

Agreement to Build
When the petition for divorce was filed in December of 1991, the parties were living in a home on South Walton Street that Mrs. Pelafique owned prior to the marriage. Although they physically separated after the filing of the petition, they purchased a lot in May of 1992 and began construction of a home on East Jevon Street in Morgan Creek Subdivision. Earlier in 1992, they had entered into the following agreement:
March 14, 1992
AGREEMENT TO BUILD
I. We agree to establish a joint checking account from which all expenditures will be paid for in regards to the cost of the house to be built at 4216 E. Jevon, Lot 8, Block 2 of Morgan Creek Subdivision.
II. The parties agree that any labor put forth on the construction of the house by either Pam or James will be done so on a free basis with no consideration to be given toward the total cost of construction Thereby, [sic] not increasing the cost of the house to the community.
III. The construction of the house will be funded entirely with community funds from the marriage between Pam & James Sudduth, II.
IV. Upon completion of the home, Pam Sudduth will be given the right of use and first option to purchase the house at its cost of construction. If she declines to purchase, then James Sudduth, II will purchase the home. The 2 options above are in the event and at the time of divorce. If reconciliation [sic] of the marriage takes place, the house will continue to be community property. At the time of divorce, the house and all community property will be divided as per the two parties agree.
 s/ James Sudduth, II 3-18-92
 s/ Pam Sudduth 3-18-92
The house was completed in November of 1992, at which time Mrs. Pelafique moved in. Because the parties did not reconcile, Mr. Sudduth never resided in the home prior to the divorce in February of 1993.
*588 Relying on the "Agreement to Build," the trial court valued the East Jevon Street home at $126,047.65, the amount of construction costs that passed through the "house account." Because the home was acquired after December 19, 1991, the termination date of the community, the trial court recognized that it was not part of the community, but that it was owned in indivision by the parties. Finding that Mrs. Pelafique had exercised her option to purchase the home, the trial court awarded it to her at a value of $126,047.65, but it allowed Mr. Sudduth a reimbursement claim for $23,380.36 in additional construction costs that he paid from his personal accounts. The parties stipulated that an expert appraiser would testify that the value of the home by the end of trial was $230,000.00.
Mr. Sudduth first argues that the "Agreement to Build" is an invalid matrimonial agreement because the parties did not comply with requirements of La.Civ. Code art. 2329. He also contends that he was induced into signing it by his wife's fraudulent representations of her intent to reconcile while he was in a depressed state over the possibility of losing his family and that the agreement should not be enforced because it is ambiguous.
La.Civ.Code art. 2329 provides that "[s]pouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules." Under La.Civ.Code art. 2325, a matrimonial regime is defined as "a system of principles and rules governing the ownership and management of the property of married persons." As explained in 16 LOUISIANA CIVIL LAW TREATISE, Spaht and Hargrave, Matrimonial Regimes § 8.6 (2d ed.1997) at 528 (footnote omitted), "The reference to a `system' contemplates a `methodic arrangement of rules' rather than an isolated or single transaction." A matrimonial agreement requiring judicial approval "is the kind of agreement that affects the classification and management of future acquisitions." Id. at 529.
In Langley v. Langley, 94-726 (La.App. 3 Cir 12/7/94); 647 So.2d 640, this court did not require judicial approval of an agreement in which the spouses divided their existing assets and debts, but did not specifically state that they intended to terminate their community. In doing so, we distinguished Langley from Poirier v. Poirier, 626 So.2d 868 (La.App. 3 Cir.1993), writ denied, 94-161 (La.3/11/94); 634 So.2d 389, in which the spouses signed a contract stating that they wished to liquidate their community and to release each other from any further accounting of community property. Viewing the evidence as a whole in Poirier, we found that the spouses "intended to terminate all rights incidental to the matrimonial regime, and not just the existing community property." Id. at 870.
In the present case, the trial court upheld the agreement as valid, finding that the spouses were free to contract for its object, the building of a house, under La. Civ.Code art. 2336. We find no error in this conclusion. Nowhere in the "Agreement to Build" do the parties indicate that they wish to terminate or modify their community regime. Although the agreement concerns the acquisition of one future asset, it concerns only the valuation, and not the classification, of that asset. Indeed, the only mention of classification is in paragraph IV, which states that if the parties reconcile, the house will remain community. This provision, however, merely restates the legal result of reconciliation.
*589 Mr. Sudduth next argues that the agreement should be nullified for fraud because Mrs. Pelafique induced him to sign it with promises of reconciliation when, in fact, she always intended to end the marriage. In support of his position, he cites a journal kept by Mrs. Pelafique, in which she expressed strong feelings for another man while the house was under construction and in which she stated her belief that divorce was inevitable. He also relies on the testimony of Mrs. Pelafique's former co-worker, Karla Fusilier, who stated that she believed Mrs. Pelafique would do anything to get the house. At trial, Mrs. Pelafique denied that she promised to reconcile as a condition of the agreement. She testified that after she filed for divorce Mr. Sudduth repeatedly approached her about building a house and that she signed the agreement because she was afraid he was using the house to trap her financially into the marriage. Mrs. Pelafique also introduced evidence of possible bias of Ms. Fusilier, who was fired upon Mrs. Pelafique's discovery that her co-worker was misappropriating company funds.[1]
La.Civ.Code art. 1953 defines fraud as "a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La.Civ.Code art. 1957 provides that "[f]raud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence."
In the present case, the trial court found that fraud was not involved in the consent of either party. For the following reasons, we find no error.
Part of Mr. Sudduth's argument in this assignment is that Mrs. Pelafique took advantage of his fragile emotional state in getting him to sign the agreement. Mr. Sudduth received emergency counseling the day he was served with the petition, December 19, 1991, by a psychiatrist, Dr. Harper Willis. Dr. Willis treated him through February 17, 1992 for anxiety and depression, prescribing medications through April of 1992. At trial, Dr. Willis testified that he believed Mr. Sudduth would have done anything in March of 1992 to save his marriage. However, Dr. Willis also testified that, as of his last visit in February of 1992, he considered Mr. Sudduth to be thinking clearly, capable, and functional, with the medications reaching therapeutic levels by that time. The "Agreement to Build" was signed one month later, on March 18, 1992.
Mrs. Pelafique also received counseling, seeing a psychologist, Dr. Brenda Roberts, from May through November of 1991. After a joint session with both spouses in June of 1992, Dr. Roberts believed that Mrs. Pelafique needed individual counseling to clarify her feelings about her husband to determine whether the marriage could be saved. Dr. Roberts described Mrs. Pelafique as extremely confused and scared of making a wrong decision that would ruin her life. Dr. Roberts saw building the house as a way for Mrs. Pelafique to regain feelings for her husband, although that, in fact, did not happen as the project progressed. Although Mrs. Pelafique's journal illustrated her infatuation with another man, Nolen Stokeld, Dr. Roberts testified that Mrs. Pelafique always expressed her faithfulness to her husband during their sessions and in her *590 journal. According to Dr. Roberts, Mrs. Pelafique took a long time to realize that she no longer loved her husband.
Mr. Sudduth also contends that the "Agreement to Build" included Mrs. Pelafique's promises that she would allow a trial reconciliation for six months after the house was completed and that she would no longer see Mr. Stokeld, with whom Mr. Sudduth suspected she was having an affair. These two conditions, however, are not contained in the agreement itself or in two previous drafts of that document. Additionally, Mr. Sudduth did not mention these alleged broken promises in a letter that he wrote to Mrs. Pelafique acknowledging that it was time for them to come to an agreement about the cost of the house.

The East Jevon Street House
After allocating the home to Mrs. Pelafique, the trial court valued it at $126,047.65, the amount of construction costs that passed through the "house account," but awarded Mr. Sudduth reimbursement for $23,380.36 in additional costs paid by him. In the valuation of other assets, the trial court also awarded Mr. Sudduth additional credits of $39,000.00 and $7,000.00 for monies spent on the house.

Valuation and Credits
Although the judgment reflects the Jevon Street home as "allocated" to Mrs. Pelafique, the trial court actually enforced the "Agreement to Build" by finding that Mrs. Pelafique exercised her option to purchase the home at the cost of construction. Mr. Sudduth argues that the cost of construction should have been fixed at $152,351.85, rather than $126,047.65, to reflect additional expenses of $26,304.20 which he paid. As already noted, the trial court awarded Mr. Sudduth reimbursement for $23,380.36 of those expenses. Mr. Sudduth argues that he should have been reimbursed the entire $26,304.20 and that the trial court failed to give him credit for an additional $60,000.00 that he spent on the house.
Mr. Sudduth contends that Mrs. Pelafique had exclusive control of the "house account" and prevented him from being reimbursed for the additional construction expenses by unilaterally closing it on December 29, 1992. He also contends that she refused to reimburse him in November of 1992 when he presented those expenses to her. Mrs. Pelafique acknowledged that she maintained possession of the checkbook, but she also testified that they had equal access to the account, as both of their signatures were required on each check. Reviewing a list of the claimed expenses, we note that they were ongoing, having been incurred as early as February of 1992. Thus, Mr. Sudduth had ample time to "pass" them through the "house account." In any event, the trial court awarded Mr. Sudduth reimbursement for all but $2,923.84 of the claimed expenses.
The trial court did not state its reasons why it disallowed the remaining expenses of $2,923.84; however, we note that many of them were incurred after the house was completed. Accordingly, we find no error in the denial of these expenses. The trial court also determined in the valuation of other assets that Mr. Sudduth was only entitled to a credit of $46,000.00 spent from those assets on the house. After reviewing the record, we cannot say that the trial court erred.

Option to Purchase
Mr. Sudduth argues that Mrs. Pelafique never exercised her first option to purchase the house within a reasonable time. It is undisputed that Mrs. Pelafique and the parties' minor son continually occupied the home since its completion. By *591 letter dated September 29, 1994, Mrs. Pelafique's attorney stated that her client intended to exercise the option at that time, and at trial, Mrs. Pelafique testified that she "orally" exercised this option. The "Agreement to Build" also provided that Mr. Sudduth would purchase the home if Mrs. Pelafique declined to do so. There is no evidence that Mr. Sudduth took any steps toward the purchase of the home before Mrs. Pelafique's written notice of intent. We, therefore, find no error in the trial court's finding that Mrs. Pelafique did indeed exercise this option.

Rent
Mr. Sudduth argues that the trial court erred failing to award him rent for Mrs. Pelafique's use of the East Jevon Street home, given that Mrs. Pelafique has remarried and is occupying the home with her new husband to his exclusion. Although Mr. Sudduth bases his claim for rent on Mrs. Pelafique's remarriage in 1993, he seeks rent from the termination of the community in 1991.
The parties agree that, because the East Jevon Street Home was never occupied as the family home, La.R.S. 9:374(C) does not apply. However, as the supreme court recognized in McCarroll v. McCarroll, 96-2700 (La.10/21/97); 701 So.2d 1280, an award of rent under La.R.S. 9:374(C) is, nonetheless, based upon the law of co-ownership, which is applicable here. We, therefore, consider McCarroll helpful in analyzing the present case, even though that decision involved an application of La. R.S. 9:374(C). In McCarroll, 701 So.2d at 1289, the supreme court summarized the principles of co-ownership as follows:
The use and management of a thing held in indivision is determined by agreement of all the co-owners. La.Civ. Code art. 801. A co-owner is entitled to use the thing held in indivision according to its destination, but he cannot prevent another co-owner from making such use of it. La.Civ.Code art. 802. Nevertheless, it is well established that a co-owner need not pay rent to another co-owner for his exclusive use of the co-owned property.
Thus, "a co-owner in exclusive possession may be liable for rent, but only beginning on the date another co-owner has demanded occupancy and has been refused." Id. at 1290. In the present case, we do not find that Mr. Sudduth ever requested occupancy of the East Jevon Street home. Although it is clear that Mr. Sudduth wanted to reconcile with his wife once the house was completed, we do not construe this wish as a demand for occupancy of the home. Rather, it appears that Mrs. Pelafique and the minor child continued to occupy the home with Mr. Sudduth's consent. Accordingly, we find no error in the trial court's refusal to award Mr. Sudduth rent for Mrs. Pelafique's occupancy of the home.
We further find that Mr. Sudduth's reliance on Herrell v. Herrell, 594 So.2d 943 (La.App. 3 Cir.1992), is misplaced, as that case has been clearly overruled by McCarroll. In Herrell, this court considered the occupying spouse's transformation of the former family home into his new marital home as one factor supporting a retroactive award of rent to his former spouse. McCarroll now prohibits such an award. For a post-McCarroll decision, see Ball v. Ball, 32,852 (La.App. 2 Cir. 3/1/00); 757 So.2d 824, in which the court held that denying an occupying spouse's reimbursement for mortgage payments made after her new husband moved into the former family home amounted to an indirect assessment of rent, which was prohibited under McCarroll, notwithstanding the new husband's occupancy of the home.

*592 Treasury Note No. 1430
Before her marriage, Mrs. Pelafique owned a home at 1504 South Walton Street, which she had purchased for $56,800.00 on June 24, 1983. At the time of her marriage on March 3, 1984, Mrs. Pelafique owed an outstanding balance of $23,534.08 on the home. On July 1, 1990, after that indebtedness had been paid off with community funds, she sold the home to the Sudduth Clan, a partnership of Mr. Sudduth and his siblings, for $59,503.48. It is undisputed that Mrs. Pelafique did not receive any funds from the sale of the home and that the Sudduth Clan did not advance any of its funds. Rather, Mr. Sudduth's father deposited a large sum of money into the parties' community checking account on July 10, 1990. The elder Mr. Sudduth memorialized $59,503.48 of this transaction as a "gift to children." Also on July 10, 1990, the younger Mr. Sudduth wrote a check from that account for $59,503.48the exact amount of the purchase price of the South Walton Street homefor the purchase of a treasury note. The next day, Calcasieu Marine National Bank issued to him Treasury Note No. 1430, which had a face value of $60,000.00 and a stated cost of $59,503.48. When Mrs. Pelafique later learned that the treasury note was issued in her husband's name, she insisted that he place her name on it with his handwritten acknowledgment that the note "belongs entirely to my wife Pamela Ann Sudduth as her separate property."
The trial court classified the treasury note as Mrs. Pelafique's separate property, but awarded Mr. Sudduth reimbursement for one-half of the interest it earned through the termination of the community, as Mrs. Pelafique did not reserve these funds as her separate property. The trial court also awarded Mr. Sudduth reimbursement for one-half of community funds spent on the principal indebtedness of the home and one-half of community funds spent on home improvements.

Classification and Reimbursement
Mr. Sudduth argues that the treasury note should be classified as community property because it was purchased with funds from a community account. He also contends that, because the community had an interest of 44% in the purchase price of the treasury note through its investment in the principal indebtedness and improvements on the home, the note cannot be Mrs. Pelafique's separate property, as "the value of the community things is [not] inconsequential with the value of the separate things" under La.Civ.Code art. 2341.
"Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property." La.Civ.Code art. 2340. See also Granger v. Granger, 98-429 (La.App. 3 Cir. 12/9/98); 722 So.2d 107. The trial court's classification of property is a factual determination subject to the manifest error standard of review. Lytal v. Lytal, 00-1934 (La.App. 1 Cir. 11/14/01); 818 So.2d 111, writ denied, 01-3272 (La.3/8/02); 810 So.2d 1164.
We find no error in the trial court's conclusion that evidence "overwhelmingly" establishes that the treasury note is Mrs. Pelafique's separate property. When the timing of these transactions is considered with (1) the purchase price of the note being identical to that of the home and (2) that no other funds were issued to Mrs. Pelafique for the sale of her home, we find that she has more than adequately overcome the presumption of community in La.Civ.Code art. 2340. Mrs. Pelafique may not have had $60,000.00 in separate funds to purchase the treasury note, as *593 Mr. Sudduth argues, but she did own a $60,000.00 piece of immovable property that she sold. The community's expenditures on that immovable property are protected by La.Civ.Code art. 2366, which provides in part: "If community property has been used for the acquisition, use, improvement, or benefit of the separate property of a spouse, the other spouse is entitled upon termination of the community to one-half of the amount or value that the community property had at the time it was used." The trial court correctly applied this article.

Interest
Mrs. Pelafique argues that the trial court erred in awarding Mr. Sudduth one-half of the interest earned by this treasury note through the termination of the community, in the absence of a request for such reimbursement. However, Mr. Sudduth has always argued that the treasury note was community property, and his testimony references a claim for interest earned after the date of termination, had that note been classified as community. We find that the issue of interest was properly before the trial court and that the trial court did not err in its reimbursement award to Mr. Sudduth.

Treasury Note No. 1429
On July 10, 1991, Mr. Sudduth purchased Treasury Note No. 1429 with a face value of $50,000.00 with funds from a community checking account. The note had a maturity date of February 15, 1993. Mrs. Pelafique testified that this note was purchased, in part, with $40,000.00 received from the sale of a community lot in Oak Park subdivision to Mr. Sudduth's parents and with an additional $10,000.00 in community funds. Mr. Sudduth testified that he subsequently transferred this note to his father as payment for a community indebtedness, so that the note was no longer in his possession when the community terminated in December of 1991. When questioned about a deposit of $52,062.50 that he made in March of 1993 with reference to a "CMNB T-Bill," Mr. Sudduth explained that his father cashed in the treasury note then turned over the proceeds to him as another loan. The trial court did not accept this explanation and allocated the note to Mr. Sudduth as a community asset with a value of $50,000.00. The trial court also allocated the interest earned on the treasury note, $6,525.00, to Mr. Sudduth. In these assignments of error, Mr. Sudduth argues that the trial court erred in finding that the note was community property in his possession on December 19, 1991 and in charging him with receiving $6,525.00 in interest.
The trial court based its ruling on inconsistencies in Mr. Sudduth's testimony and on Mr. Sudduth's inability to document the treasury note as a payment on a loan from his father. In his deposition, Mr. Sudduth testified that he transferred the note to his father when it matured February of 1993. At trial, however, Mr. Sudduth testified that he transferred the note to his father in July of 1991, claiming that he and Mrs. Pelafique no longer owned the note after that date because it was given as payment for a community indebtedness. In support of this claim, Mr. Sudduth offered the personal transaction journal of his father, but he admitted that the journal was incomplete and that it did not reflect a reduction in debt from the transfer of the treasury note. Mr. Sudduth also offered the expert testimony of Daphne Clark, a CPA, but it appears that her opinions were largely based upon Mr. Sudduth's explanations of the transactions between him and his father. Ms. Clark also stated that she would not advise her clients to structure similar transactions in this manner. Mr. *594 Sudduth admitted that the interest from the treasury note was reported on the joint income tax return that he and Mrs. Pelafique filed for 1992, but he maintained that he, in effect, was reporting his father's income as his own.
We find the record amply supports the trial court's classification of the treasury note as community property. By Mr. Sudduth's admission, the transaction journal "didn't accurately reflect what was taking place," in that "the debits did not equal the credits" on this issue and that the journal did not memorialize the treasury note as payment on a debt. We further find Ms. Clark's testimony unpersuasive for the reasons stated above. Mr. Sudduth has not demonstrated that this treasury note was purchased with separate funds or that it was no longer in his possession when the community terminated in December of 1991. Upon finding that the treasury note was community property, the trial court did not err in charging Mr. Sudduth with interest earned on the note, as the note was never in Mrs. Pelafique's possession.

The 1991 Mazda Automobile
In March of 1991, Mr. Sudduth purchased a new Mazda automobile for his wife for approximately $23,000.00. When the parties separated in December of 1991, Mrs. Pelafique continued to use the car as her own. In January of 1995, the parties executed an act of donation to transfer title of the car from Mr. Sudduth to Mrs. Pelafique. The act of donation, which was prepared and notarized by Mr. Sudduth's attorney, estimated the vehicle's value at $20,000.00 and listed its mileage at 40,180 miles. Both parties agreed that the purpose of the donation was for Mrs. Pelafique to obtain insurance on the car in her name. On April 6, 1997, Mrs. Pelafique sold the Mazda for $7,300.00.
The trial court allocated the Mazda to Mrs. Pelafique at a value of $7,300.00, stating that it considered depreciation in reaching this figure. Mr. Sudduth argues that the vehicle should have been valued at $20,000.00 because that is the amount listed as its estimated value in the 1995 act of donation and because he was not consulted prior to its sale. We disagree. Mrs. Pelafique testified that the purpose of the donation was to transfer title rather than to set a value for these proceedings. At the time of the sale, the car was six years old. Additionally, the vehicle was no longer in either party's possession at the time of trial. Hence, rather than valuing the automobile, the trial court, in effect, held Mrs. Pelafique accountable for the $7,300.00 of former community funds in her possession. The trial court did not err.

Sudduth and Associates Capital Account
The trial court allocated this asset to Mr. Sudduth at a value of $68,033.26, based upon the K-1 form in the parties' joint tax return for 1991. Mr. Sudduth argues that the trial court failed to consider withdrawals made from this account during the existence of the community that are also reflected on the K-1 form.
Mr. Sudduth testified that he began working at Sudduth and Associates in 1989, when his father formed the partnership with an initial investment of $10,000.00, of which $2,500.00 was credited to Mr. Sudduth's capital account as a gift. Mr. Sudduth also testified that his father advanced him $40,000.00 as an incentive to join the firm, but that his father demanded he return that money when he left the firm in November of 1991. According to Mr. Sudduth, in 1989 his father also transferred $50,000.00 of the firm's money into his personal Charles Schwab *595 account so that he and Mrs. Pelafique could benefit from the interest it earned; he also had to return those funds in November of 1991.
Mr. Sudduth testified that he repaid the $50,000.00 in three installments: (1) with a check for $12,000.00 as a partial payment in January of 1991; (2) with a charge against his capital account in November of 1991 of $23,525.30 for the Mazda that he bought for his wife in March of 1991; and (3) with a final check of $14,474.70 dated November 3, 1991, which was outstanding from his Charles Schwab account on the date the community terminated. He argues that the return of the $40,000.00 and the charge against his capital account of $23,525.30 for his wife's car are withdrawals that the trial court should have considered in valuing this account.
The parties' 1991 K-1 form showed a balance at the beginning of the year of $60,005.77, to which $8,027.49 was added as partner contributions, and from which $65,095.60 in withdrawals was subtracted, leaving an ending balance of $2,937.66. In its written reasons, the trial court described Mr. Sudduth's explanations for the withdrawals as "highly suspect," stating that it gave "absolutely no weight" to Mr. Sudduth's accounting statements. In particular, the trial court completely discounted a handwritten document in which Mr. Sudduth's father outlined the details of the $40,000.00 transaction.[2] The trial court also refused a credit for the car, as that item had been purchased some seven months before the "charge" against the capital account with funds from another account.
After viewing the totality of the record, we find no error. We first note that the credits claimed do not total the amount of withdrawals on the K-1 form. We also agree with the trial court that the timing of the transactions is questionable, including the purchase of the car in March not being "charged" against the capital account until November. Although the K-1 form does show withdrawals of $65,095.60, the trial court must have concluded that Mr. Sudduth's explanations for them amounted to accounting entries between him and his father rather than actual transactions.

Mrs. Pelafique's Bonus
At her employer's Christmas party in 1991, Mrs. Pelafique received a $5,000.00 bonus, from which she netted $4,067.50. On January 2, 1992, she made a $5,507.44 deposit that included this bonus as well as other unidentified funds. The trial court found that the deposit was made with Mrs. Pelafique's separate funds. Mr. Sudduth argues the trial court erred in not classifying the entire deposit as community because the bonus represented compensation for work performed during the existence of the community and the other funds included pay checks that were issued during the community.
Mrs. Pelafique testified that she was unaware that she would receive a bonus in 1991, as she had been employed at that business for less than one year. She also did not remember what other funds were included in the deposit. The trial court found her testimony "very truthful and honest."
It is clear that Mrs. Pelafique neither received nor deposited the bonus before the community terminated. Hence, there is no presumption that the bonus is community property. In support *596 of his position that it is, Mr. Sudduth relies upon Preis v. Preis, 94-442 (La. App. 3 Cir. 11/2/94); 649 So.2d 593 and Starr v. Starr, 557 So.2d 1026 (La.App. 4 Cir.1990). We find those cases clearly distinguishable from the present case. In Preis, the bonus at issue, paid to a partner in a law firm, was based upon the cash profits of the firm, with the right to receive the bonus accruing as accounts receivable were turned into cash. Starr concerned a commission check received after the termination of the community for work performed during the existence of the community. In the present case, there is no evidence that Mrs. Pelafique's bonus represented compensation for services performed before termination of the community. Mrs. Pelafique was a salaried employee of a construction company. Unlike the attorney in Preis, she had no ownership interest in the firm. Unlike the employee in Starr, Mrs. Pelafique had already been paid for the work that she performed during the existence of the community. Without other evidence, we can only conclude that her bonus was earned when it was paid. We find no error in the trial court's conclusion that the entire deposit of January 2, 1992 was made with Mrs. Pelafique's separate funds.

The Armstrong Street Property
Mr. Sudduth argues that the trial court erred in finding this lot to be community property. The property was purchased during the marriage on August 28, 1987, from Mary Krebs for a stated price of $14,000.00. The act of sale identified the vendee as "JAMES E. SUDDUTH, II, married to and living with Pamela Ann Sudduth, born Meche." Mr. Sudduth testified that he paid for the lot in full with a check for $13,840.32 from a bank account entitled "James E. Sudduth, II, C.A." He testified that the "C.A." notation referred to "Clan Account," as that account contained only funds owned by the Sudduth Clan, in which he is a partner. Mrs. Pelafique testified that she did not know what funds were used to purchase the property. At trial, Mrs. Pelafique dropped any claim that the Sudduth Clan was a community partnership, and the "C.A." account was not before the trial court as a community asset.
On July 1, 1988, the Sudduth Clan entered into a lease/purchase agreement with Clarence Guidry over the subject property. Mr. Sudduth attempted to introduce other evidence of the Sudduth Clan's ownership of the property, such as reporting rentals from the property on its tax returns, but the trial court refused to admit these items. While this suit for partition was pending, Mr. Guidry sued Mr. Sudduth and Mrs. Pelafique for not allowing him to exercise his option to purchase the property as provided in the lease/purchase agreement. In finding the lot to be community property, the trial court stated that the act of sale "speaks for itself." The trial court also expressed concern that Mr. Sudduth attempted to "controvert" the deed, yet expected Mrs. Pelafique to share some responsibility in the lawsuit filed by Mr. Guidry.
In Granger, 722 So.2d 107, the husband successfully demonstrated that the family home was purchased with his separate funds, even though the act of sale listed both the husband and wife as purchasers. Our inquiry in that case focused on the source of the funds rather than the language of the deed. In the present case, the act of sale places the property in Mr. Sudduth's name only. That document creates a presumption that the property is community, as it is evidence that the property was in Mr. Sudduth's possession during the existence of the community. However, *597 Mr. Sudduth is entitled to rebut that presumption by proving that he acquired the property with separate funds or with mixed funds in which the community funds are inconsequential when compared to separate funds used. Ziegler v. Ziegler, 537 So.2d 1207 (La.App. 4 Cir.1989). Mr. Sudduth produced a check noting payment for the "Krebs lots" from an account in his name that was not claimed as a community asset. When this evidence is considered with Mrs. Pelafique's testimony that she did not know what funds were used to purchase the lot, we find the trial court erred in holding that Mr. Sudduth failed to rebut the presumption of community. At trial, the parties stipulated that the value of the property was $20,000.00, and the trial court allocated it to Mr. Sudduth for that amount. We will, therefore, amend the trial court judgment to delete this asset from those assigned to Mr. Sudduth.

The Vanguard Accounts
Mr. Sudduth argues that the trial court erred in valuing two Vanguard accounts at the time of the termination of the community rather than at the time of trial. On December 19, 1991, the balance of the Vanguard MMI account was $6,004.30; the Vanguard Tax Free account had a balance of $10,292.62, to which a growth of $593.50 was added before it was transferred to another account. By the time of trial, both accounts had been closed, and their balances transferred to Mr. Sudduth's First Federal Savings and Loan Account No. XXXXXXXXX-XX. In valuing these accounts, the trial court allowed Mr. Sudduth a $7,000.00 credit for funds transferred to the "house account" and it charged him with receiving the difference of $9,890.42.
In Ball, 757 So.2d 824, the court recognized that the trial court has the discretion of valuing cash accounts at the time of termination, where a decrease in value is attributable to one spouse's use of the funds. In such a case, it is incumbent on that spouse to show that his withdrawal of funds benefitted the community as a whole. In Ball, the spouse who used the funds was charged with their full value at termination because he did not offer an accounting. In the present case, the trial court apparently traced the funds from the Vanguard accounts to Mr. Sudduth's checking account in determining that he was entitled to a $7,000.00 credit for funds transferred to the "house account." At trial, the attorneys alluded to $9,000.00 from the Vanguard accounts making its way into the "house account." Although there was no direct transfer from the Vanguard accounts to the house account, an exhibit indicates that $7,000.00 was transferred from Mr. Sudduth's First Federal checking account to the "house account" in June of 1992, around the time that the Vanguard funds were transferred to the checking account. We find no error in the trial court's valuation of these accounts.

First Federal Checking and Savings Accounts
In valuing Mr. Sudduth's checking account at First Federal Savings and Loan, the trial court began with its balance at termination, $25,254.35. From accountings provided by the parties, it then determined that Mrs. Pelafique received $11,717.90 of this money and Mr. Sudduth received the remaining balance of $13,536.45. Because Mr. Sudduth received $1,818.55 more than Mrs. Pelafique, the trial court ordered him to reimburse her one-half of this amount, or $909.28.
Mr. Sudduth argues that the trial court erred in failing to trace amounts in this bank account, including funds deposited after termination, to other accounts that are at issue in this trial. We can find no error with the procedure used by the *598 trial court. If funds from community accounts that existed at termination were deposited into this account after termination, those funds should be considered in the valuation of the original accounts, as the trial court did with the two Vanguard accounts. The issue then becomes one of proof. Non-community funds deposited into a community account after termination are generally not before the trial court in a community property partition. Elsewhere in its ruling, the trial court did award Mr. Sudduth reimbursement for funds spent on the construction of the East Jevon Street home. Again, we find no error in the trial court's ruling as to what credits were proved regarding the use of community funds.
The trial court valued Mr. Sudduth's First Federal Savings and Loan savings account at $1,431.09, its balance at termination, believing that there was no dispute about this account. Mr. Sudduth argues that the savings account should have no value because it was closed before trial. In the absence of an accounting as to the use of these funds, we find no error. However, as pointed out by Mrs. Pelafique, this asset was omitted from the trial court's final calculation, even though it was allocated to Mr. Sudduth in the reasons for judgment. We will, therefore, amend the trial court judgment to include this asset in its final calculation.

The Charles Schwab Account
The trial court allocated this asset to Mr. Sudduth at a value of $179,029.91. It reached this amount by taking the balance of the account at termination, $232,504.61, then subtracting an outstanding check of $14,474.70, for a new total of $218,029.91. From that amount, the trial court deducted $39,0000.00 as a credit for funds spent on the purchase of the land for the East Jevon Street home.
In three assignments of error concerning this account, Mr. Sudduth argues that the trial court erred in finding that the account was opened with community funds, in failing to give him credit for an additional $20,0000.00 that was transferred to his checking account, and in failing to recognize that approximately $150,000.00 of his separate funds were in this account. Mrs. Pelafique argues that the trial court erred in deducting the outstanding check from the account balance and in failing to consider the growth of the account after termination of the community.
The account was opened in October of 1985 with a $6,456.13 deposit from Mr. Sudduth's account at American Bank of Commerce. Mr. Sudduth agreed that some of his paychecks, which were community funds, were deposited in that account before he opened the Charles Schwab account. Mr. Sudduth contends that the trial court declared the entire account community based upon this deposit alone, without considering the source of other funds that were deposited in the account. However, in its written reasons, the trial court explained how it reached its conclusion as follows:
Mr. Sudduth must by law, trace the asset he claims would be his separate [property] and then show this [C]ourt, that the asset retained its separateness. What this Court has determined, is that money was transferred from one account to ANOTHER account to ANOTHER and ultimately that money from the latter accounts landed in the Schwab account. After a thorough review of the hundreds of documents introduced for this asset, the Court finds that the funds used to start this account have become hopelessly intertwined and incapable of distinction. *599 It is clear from these reasons that the trial court considered more than the initial deposit in classifying this account. We, too, have reviewed the documents pertaining to this asset, and we reach the same conclusion. Mr. Sudduth has failed to rebut the presumption of community. The trial court was not clearly wrong in classifying the Charles Schwab account as a community asset and in the credits it awarded. We also find no merit to Mrs. Pelafique's arguments regarding this account. The outstanding check was properly deducted from the account's balance at termination, as Mr. Sudduth enjoyed the right of equal management of this account before termination. While Mrs. Pelafique may have been entitled to share in the growth of the account, we are unable to calculate that amount with any degree of certainty. Accordingly, the trial court's classification and valuation of this asset are affirmed.

Attorney Fees and Costs
In these assignments, Mr. Sudduth argues that Mrs. Pelafique should be assessed with attorney fees because of her fraudulent and deceptive behavior and that the trial court erred in assessing 70% of the costs to him and 30% to Mrs. Pelafique.[3] Mr. Sudduth's claim for attorney fees is apparently based upon La.Civ.Code art. 1958, which provides that "[t]he party against whom rescission is granted because of fraud is liable for damages and attorney fees." In light of our affirmation of the trial court's finding that Mrs. Pelafique did not act with fraudulent intent, this article is not applicable. It is also well-settled that "[t]he allocation of court costs among the parties is a matter which is subject to the discretion of the trial court, La.C.C.P. art. 1920, and its allocation of those costs will not be disturbed absent evidence of an abuse of that discretion." Ball, 757 So.2d at 829. In assessing costs, the trial court found these percentages fair "based on the amount of evidence introduced." We find no error.

Unjust Enrichment
Mr. Sudduth asks this court to consider a remedy based upon unjust enrichment, should we find no other basis for relief. One requirement to recover under unjust enrichment is that a party have no other remedy based in law. Mr. Sudduth did have a remedy at law, but the trial court found that he could not substantiate his claims. Additionally, as Mrs. Pelafique argues, one may not recover under unjust enrichment where "the enrichment comes from a valid juridical act or the law." La.Civ.Code art. 2298. We find no basis to grant Mr. Sudduth relief under this assignment.

Decree
For the above reasons, the judgment of the trial court is amended to delete $20,000.00, representing the value of the Armstrong Street property, from the assets allocated to Mr. Sudduth, and to add to those assets $1,431.09, the value of the First Federal Savings and Loan savings account that was omitted. The net result of these changes is that the equalization payment owed to Mrs. Pelafique is reduced from $31,667.41 to $22,382.95. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed 80% to Mr. Sudduth and 20% to Mrs. Pelafique.
AFFIRMED AS AMENDED.
NOTES
[1] Mr. Sudduth also argues that the trial court erred in allowing an attack on Ms. Fusilier's character, in violation of La.C.E. art. 608. Because this evidence showed that Mrs. Pelafique was responsible for Ms. Fusilier's dismissal, we find that it was properly admitted under La.C.E. art. 607 to show bias against Mrs. Pelafique.
[2] The elder Mr. Sudduth died in 1995. Mrs. Pelafique argues that the trial court erred in admitting the document written in his hand as hearsay. However, given the trial court's treatment of it, we find any error to be harmless.
[3] Mr. Sudduth asserts in his appellate brief that the trial court assessed him with 75% of court costs; however, the division of costs in the reasons for judgment and in the judgment is 70% to Mr. Sudduth and 30% to Mrs. Pelafique.