DREW, J.
hln this dispute between two brothers concerning a home they own in indivisión, Eric Von Drake appeals a judgment denying his claim for fair rental value. We reverse and remand.
FACTS
Eric Von Drake (“Eric”) owns an undivided 1/3 interest in real estate located at 927 Madison Avenue in Shreveport. The property includes a family home where Eric lived for years with his now deceased parents and his two brothers, Edgar Rodgers (“Edgar”) and Homer Rodgers (“Homer”). Edgar acquired Homer’s interest, and accordingly now owns a 2/3 interest in the property.[1] Edgar and his family live in a home on the property at issue.
Since their mother’s death in January of 2002, there has been too much litigation between Eric and Edgar concerning this property, with most of the litigation having been instituted by Eric in a pro se capacity. Among the legal actions taken by the parties are:
• A petition for partition by licitation and request for injunctive relief filed by Eric against Edgar and Homer in the First Judicial District Court (“1st JDC”) in November of 2002. This suit *610 was dismissed on Eric’s motion three years later.
• A November 2005 order issued by a 1st JDC judge stating that because the 2002 suit had been dismissed, a new suit number was to be assigned to various motions and rules filed by Eric.
• A suit filed by Eric against Edgar in the 19th JDC that was transferred to the 1st JDC in November of 2005.
• A suit filed by Eric against Edgar, his wife Angela Rodgers, and Homer in federal court in Texas in 2003 or 2004.
• A peace bond sought by Edgar against Eric in September of 2006.
|2In the instant suit, Eric, now represented by counsel, filed suit against Edgar on September 22, 2006. He alleged that since February of 2002, Edgar had refused to allow him to occupy or use the home, and was thus liable to him for his share of the fair rental value of the home. Edgar made general denials in his pro se answer. The petition was later amended to add Angela as a defendant. In an answer to the amended petition, Edgar and Angela stated that Eric no longer had any legal interest in the property.
The trial court denied a motion for summary judgment filed by Eric. Following a trial on the merits, the court denied Eric’s claims against Edgar and Angela. A motion for reconsideration or to reopen the case for the introduction of additional evidence was filed by Eric. It too was denied by the trial court. Eric has appealed.
DISCUSSION

Demand for occupancy

The use and management of the thing held in indivisión is determined by agreement of all the co-owners. La. C.C. art. 801. Except as otherwise provided in La. C.C. art. 801, a co-owner is entitled to use the thing held in indivisión according to its destination, but he cannot prevent another co-owner from making such use of it. La. C.C. art. 802.
A co-owner in exclusive possession may be liable for rent, but only beginning on the date another co-owner has demanded occupancy and has been refused. McCarroll v. McCarroll, 96-2700 (La.10/21/97), 701 So.2d 1280. See Pelafigue v. Sudduth, 01-807 (La.App. 3rd Cir.5/15/02), 820 So.2d 583, writ denied, 2002-2157 (La.11/8/02), 828 So.2d 1124.
|aIn denying Eric’s claim, the trial court concluded that there was no credible evidence of demand by Eric for fair rental value. Although we sympathize with the learned trial court for valiantly trying to make heads or tails of this mess, the correct standard should have been the demand for occupancy. Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. Accordingly, we will conduct a de novo review of this record of fraternal strife.[2]
In the early 1990s, Eric renovated a back room of the family home so he could live in it. Eric last lived at the family home in 1999, and resided in Dallas at the time of his mother’s death. Even though *611 he was living elsewhere, he kept some personal belongings in the back room.
Eric had a key to the house until Edgar changed the locks after their mother’s death. Edgar did this allegedly because he was afraid that Eric would allow the keys to fall into the wrong hands out of spite. He explained that the basis of his fear was that Eric had attempted to convince their mother to change her will, and when she declined, he took her keys and Edgar did not know what Eric had done with the keys.
14Edgar disputed Eric’s claim that he had asked for a key and was refused. Edgar claimed that he did not know Eric wanted a key until he filed a partition for licitation. Nonetheless, a new key was never forthcoming, with Edgar holding the position that he would let Eric in when he requested it.
Eric claimed that he wrote to Edgar in March of 2002 to tell him that he wanted to move back into the home, but Edgar never responded. Eric also claimed that in May of 2002, Edgar would not allow him to enter the home, and Edgar would still not budge when Eric asked if he could enter to retrieve his personal belongings. Erie added that he called the police, but all Edgar did was cross his arms and refuse to let him in the house. Angela denied that Eric ever sent a letter or came to the property with the stated intention of wanting to move into the house. Angela testified that in January of 2002, Edgar told Eric to clean his room up and move in if he wanted, but Eric’s response was that he was staying in Dallas.
What happened to Eric’s personal belongings is another sore spot between the parties. Eric claimed that Edgar put his belongings in an outside storage room in 2004, and they were destroyed from exposure to the elements.
Edgar’s version is that he asked Eric to move his items because the room was dirty, and when Eric delayed in doing this, Edgar moved them into the living room. Angela recalled that:
• when Eric learned that his belongings had been moved to the living room, he said he would return to retrieve his things, but he never did;
• Edgar then moved the items into an outdoor shed; and
|r,» after Eric eventually appeared and examined his belongings, he left them in the yard.
Angela, Edgar, and Homer claimed that Eric came to the house in May or June of 2002 in order to be filmed for a music contest. Homer stated that he never heard Eric say at the time that he wanted to move into the house. There is also the claim that Eric came to the property in February of 2003, opened the gate, and walked around the yard. Edgar recalled that Eric came to the property in the spring of 2003 or 2004, but made no request to move in at the time.
There is no question that Eric did not have unrestricted access to his co-owned property. It was admitted as much by the other parties. According to Edgar, Eric was allowed on the property and came and went as he pleased until 2002, with the change in attitude prompted by Eric taking legal action against them. Eric was told that someone was always to be at the house if he came there, and he would be videotaped when in the house. They regarded Eric as being too unsafe and unworthy to enter the property. Edgar recalled that Eric’s response to this plan was that he would not come to the house if he was going to be watched.
Edgar furthered testified that:
• in the summer of 2005, Eric damaged the home’s front and screen doors *612 while attempting to enter the home, and left a notice stating that he wanted Edgar’s family out of the house;
• he told Eric, after he damaged the home, that he was in trouble; and
• after this incident, he sought a restraining order against Eric.
Things were apparently quiet between the feuding parties until the following summer. In July of 2006, Eric decided that he would create his | (iown passageway into the house by cutting a doorway in an exterior wall of the back room and installing a door. Eric claimed that he only wanted access to the back room, and his plan was to board up the door leading from that room to the rest of the house so that he would be isolated from Edgar’s family. This back room apparently had a bathroom. In any event, a large, rectangular hole suitable for a door was cut in the wall. Eric claimed that he had a subcontractor do this, but asked him to leave before completing the job when a police officer would not remain at the scene and Eric became concerned for the worker’s safety without police protection. Eric further claimed that when he returned to the home two weeks later to finish his project, Edgar would not let him in and told him there was a peace bond against him. Edgar denied telling Eric that a peace bond had been issued against him, but he told Eric that he would call the police if Eric returned to the house. Edgar repaired the hole in the wall, but eventually tore down the back room.
There was never an agreement between Edgar and Eric that Edgar would use the home to the exclusion of Eric. Although Eric may have had some inclination to exercise his rights as co-owner, no actual demand for occupancy can be construed from this record until Eric filed the instant suit seeking fair rental value for Edger’s exclusive use of the property. Prior to then, many of his actions seemed to be mainly motivated by a desire to torment Edgar. Accordingly, Eric is entitled to 1/3 of the fair rental value of the house beginning on September 22, 2006. Things become a bit trickier when determining the fair rental value.
17Stephanie Campbell testified as an expert in assessing the fair rental value of residential properties. On behalf of Eric, she calculated the house as having a conservative fair rental value of $550.00 per month. In reaching this figure, she compared the home at issue to rental homes that she had managed and she thought were comparable based upon similarities in size, construction type, and area. She based her estimate on a mere approximation of the exact size of the house. We question her valuation, as she never entered the home.
Edgar was questioned by Eric’s counsel about a pleading that Edgar had filed in the Texas litigation. In that 2004 motion to dismiss, Edgar wrote that a fair amount for back rent would be based upon $375.00 per month. If Edgar intended to mean in that motion that Eric’s 1/3 share was worth that much per month, that would give the entire house a fair rental value much higher than that even assessed by Campbell. We also recognize the context in which Edgar made that valuation; he was trying at the time to establish that the court lacked subject matter jurisdiction because the amount in controversy was less than the required amount.
Because the record is not adequate for this court to adequately assess the fair rental value of the home, we remand this matter to the trial court for a determination of the fair rental value of the home from September 22, 2006, until the date of *613 partition.[3] The amount determined should be rendered against Edgar alone.
| ^Denial of motion for summary judgment
 Eric also urges on appeal that the trial court erred in denying his motion for summary judgment. The motion was taken under advisement and then denied immediately prior to the trial on the merits, which was held eight days after the hearing on the motion. Appellate review of the grant or denial of summary judgment is de novo. Wells v. Red River Parish Police Jury, 39,445 (La.App. 2d Cir.3/2/05), 895 So.2d 676.
An opposition to the motion for summary judgment was filed on October 24, 2007. This opposition was required to be served at least eight days prior to the November 7, 2007, hearing on the motion. See La. C.C.P. art. 966(B). The opposition was not timely served.
Numerous exhibits were attached to Edgar’s opposition, including his affidavit in which he stated that in January of 2002, Eric refused his offer to “stay” in the home, and that Eric “came and went” regarding the house until 2006. Although Edgar’s opposition was not timely filed, we find no abuse of the trial court’s discretion in considering it. See Hubbard v. North Monroe Medical Center, 42,744 (La.App. 2d Cir.12/12/07), 973 So.2d 847.
Eric has a recurring history of filing pro se lawsuits against Edgar Rodgers concerning the house. Combine that with Edgar Rodgers’ pro se status in this litigation, and you have storm clouds of confusion hovering over what should have been basically a simple matter. The trial court was justifiably exasperated and felt that the matter would be best resolved by a trial on the merits. Edgar’s affidavit created a genuine issue of material fact | regarding the denial of Eric’s occupancy of the home. We find no error in the trial court’s denial of the motion for summary judgment.
CONCLUSION
We reverse the judgment denying Eric Von Drake’s claim for 1/3 of the fair rental value of the property. We remand this matter to the trial court for a determination of the fair rental value of the home from September 22, 2006, until the date of partition. All costs are to be split evenly between Edgar and Eric.
REVERSED and REMANDED.

. Each brother acquired a 1/3 interest through their parents' successions.

. We decline to consider the documents attached to Eric's motion for reconsideration/to reopen the case for introduction of additional evidence. The trial court did not abuse its discretion in denying that motion.

. The parties stated at oral argument that a partition was pending. Because of the unique facts of this spiteful case, we wonder whether perhaps this is the one home that could be partitioned in kind — i.e., partitio per serra secandum.